IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

RACHEL R DOMBECK,

      Plaintiff,

  vs.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

)
)
)
)
)
)
)
)
)
)
)

CASE NO. 5:20-CV-2831

JUDGE BENITA Y. PEARSON

MAGISTRATE JUDGE
JONATHAN D. GREENBERG

**REPORT & RECOMMENDATION**

     Plaintiff, Rachel R Dombeck ("Plaintiff" or "Dombeck"), challenges the final decision of

Defendant, Kilolo Kijakazi,[1] Commissioner of Social Security ("Commissioner"), denying her

applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental

Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423,

1381 *et seq*. ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the

undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for

a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that

the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

     On November 13, 2018, Dombeck filed applications for POD, DIB, and SSI, alleging a disability

onset date of January 20, 2016 and claiming she was disabled due to: traumatic brain injury, PTSD,

migraines, anxiety, chronic fatigue syndrome, fibromyalgia, and light and sound sensitivity.  Transcript

("Tr.") at 15, 322.  The applications were denied initially and upon reconsideration, and Dombeck

requested a hearing before an administrative law judge ("ALJ").  Tr. 141.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

On December 19, 2019 an ALJ held a hearing, during which Dombeck, represented by counsel, and an impartial vocational expert ("VE") testified. Tr. 30-88. On January 30, 2020, the ALJ issued a written decision finding that Dombeck was not disabled. Tr. 15-25. The ALJ's decision became final on October 22, 2020, when the Appeals Council declined further review. Tr. 1-3.

On December 26, 2020, Dombeck filed her Complaint to challenge the Commissioner's final decision. Doc. No. 1. The parties have completed briefing in this case. Doc. Nos. 12, 13. Dombeck asserts the following assignments of error:

> (1) The ALJ's RFC does not adequately account for Ms. Dombeck's limitations in concentration, persistence, or pace.
>
> (2) The ALJ's RFC does not adequately account for Ms. Dombeck's chronic migraines, cognitive fatigue and chronic fatigue.

Doc. No. 12, pp. 5, 8.

## II. EVIDENCE

### A. Personal and Vocational Evidence

Dombeck was born in 1983 and was 32 years old on her alleged disability onset date, making her a "younger" person under social security regulations. Tr. 24. *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c). She is a college graduate and is able to communicate in English. Tr. 40. She has past relevant work as a health club manager and a chiropractic assistant. Tr. 84.

### B. Relevant Medical Evidence[2]

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. Dombeck's brief does not comply with the Court's Initial Order because she did not cite the proper page number when referring to the evidence. See Doc. No. 4, p. 3 ("[C]**itations to the Transcript should refer to the page number indicated on the lower right hand corner of the document, and NOT to the PageID # at the top of the document**.") (emphasis in original). Dombeck cited the PageID number, not the Transcript number. And rather than presenting a "**full recitation of all relevant evidence**" in the "Facts" section of her brief as the Order instructs (Doc. No. 4, p. 4) (emphasis in original), the sparse "Facts" section of Dombeck's brief includes, in some cases, one sentence followed by a string cite of up to 18 non-consecutive transcript pages. See, *e.g.*, Doc. No. 13, p. 3 (string citing 18, 13, and 18 pages of the transcript in support of one sentence). Nevertheless, the undesigned has discussed the relevant transcript pages referenced by Dombeck.

2

Dombeck reported having experienced periodic migraine headaches since her early twenties.  Tr. 446.  On January 22, 2016, at age 32, Dombeck visited her family doctor Laura Barr, M.D., the day after she slipped in the shower, fell, and hit the right side of her face.  Tr. 721.  She complained of a severe headache when she woke up that morning with nausea and vomiting.  Tr. 721.  Her exam was normal other than mild tenderness of her right cheek and a CT scan of her brain showed no acute disease.  Tr. 721-722, 500.  She was diagnosed with a concussion.  Tr. 722.  Two days later, a brain MRI showed a possible pituitary lesion and no acute disease.  Tr. 498.

On March 21, 2016, Dombeck saw Dr. Barr for her well exam.  Tr. 710.  She reported a decreased energy level upon waking in the morning but it was improving.  Tr. 710.  She slept eight hours per night.  Tr. 710.  She stated that she was slowly improving from her concussion and that she still had occasional headaches.  Tr. 710.  She reported that that morning, about halfway through her 5-hour work shift, she felt a headache coming on, took Tylenol and a break, and her headache resolved.  Tr. 710.  The week before she had a headache for which she had to take her prescription medication (Tramadol and Zofran).  Tr. 710.  She endorsed depression, anxiety, trouble falling asleep, increased stress, and decreased memory.  Tr. 711.

On March 22, 2016, Dombeck saw neurologist Kevin Weber, M.D., at the Cleveland Clinic for an evaluation of her headaches and concussion symptoms.  Tr. 444.  She also reported nausea and/or vomiting, light and noise sensitivity, and cognitive and mood symptoms.  Tr. 444.  Upon exam, she had mild neck and shoulder tenderness and normal neurological, motor, and mental status examination findings.  Tr. 449-450.  Dr. Weber diagnosed intractable migraine without aura.  Tr. 444.  He prescribed Maxalt for severe migraines, Mobic or over-the-counter medications as needed, counseled her to limit the use of those abortive medications and to start Effexor for prevention, and to eliminate Tylenol PM and avoid Tramadol and other narcotics.  Tr. 444-445.  Dr. Weber commented that her prognosis was

3

good, as she was already improving, and that he would consider cognitive/physical therapy if she did not improve.  Tr. 445.  He encouraged her to exercise and follow up in two months.  Tr. 445.

On March 23, 2016, Dombeck went to the emergency room due to a reaction from Effexor.  Tr. 407.  She was treated, discharged, and advised to discontinue Effexor.  Tr. 407.  On March 25, she spoke to Dr. Weber and stated that she wanted to "try vitamin supplements for now" and that "[M]axalt was effective as an abortive medication."  Tr. 443.  Dr. Weber advised that it was fine for her to try vitamin supplements and to call back if things worsened or failed to improve.  Tr. 443.

On June 7, 2016, Dombeck saw Dr. Weber and Eric Baron, D.O., for her follow-up appointment.  Tr. 440.  Dr. Weber wrote, "Her post-concussion cognitive and mood symptoms are improving, and her headaches have improved significantly as well."  Tr. 440.  She also reported sleeping well, exercising more (walking, biking, and weight training) and that her cognitive symptoms and neck pain had been improving.  Tr. 441.  She was advised to follow up if her symptoms failed to improve further or worsened.  Tr. 440.  Her diagnosis was migraine without aura, not intractable.  Tr. 439.

 On October 17, 2016, Dombeck called Dr. Weber's office and stated that she was still having symptoms.  Tr. 439.  She requested a referral to attend a multidisciplinary brain rehabilitation center in Atlanta, Georgia.  Tr. 439.  Dr. Baron responded, "This is not something I would be doing," and offered to refer her to the Cleveland Clinic's Center for Brain Health.  Tr. 439.

On November 4, 2016, Dombeck drove herself to the emergency room for headache complaints.  Tr. 405.  She endorsed nausea and light sensitivity.  Tr. 405.  She was treated, felt better, and was discharged the same day.  Tr. 405.  On November 10, she followed up with Dr. Barr's office reporting worsening headaches over the past month and being discouraged and depressed as a result of that and from the lack of answers.  Tr. 699.

On January 9, 2017, Dombeck went to the Cleveland Clinic's Center for Brain Health for an

4

evaluation.  Tr. 435, 905.  She reported memory problems, sleep problems (too much or too little), headaches, fatigue, anxiety, depression, sound/light sensitivity, and not being able to return to work full time.  Tr. 910.  She had not been able to perform her usual activities such as exercising and hiking, she had decreased socializing even with her family, and she had difficulty multitasking.  Tr. 435.  Upon exam, she had a depressed mood/affect and all other mental status and neurological findings were normal.  Tr. 436-437.  The impression was no memory or cognitive deficit.  Tr. 437.  She was assessed as having had a traumatic brain injury with depression and deficits in working memory but independent in activities of daily living.  Tr. 437.  She was prescribed Zoloft, referred to occupational and cognitive therapy, encouraged to maintain a healthy lifestyle, and counseled on tasks to improve working memory.  Tr. 437.

On January 13, 2017, Dombeck began occupational therapy; she complained of fatigue and not being able to socialize or get things done.  Tr. 432-433.  Her prognosis was "[g]ood due to good overall health status."  Tr. 434.  On February 13, she stated that she felt like she was getting better and that her coordination was improving.  Tr. 432.

On March 7, 2017, Dombeck returned to the Center for Brain Health.  Tr. 893.  She stated that, since her last visit, she has made some progress in her ability to cope with changes and that techniques she had learned from her cognitive therapy had helped.  Tr. 893.  She reported "No headaches.  Normal sleep and is more active."  Tr. 893.  As a result, she decided not to start Zoloft.  Tr. 893.  She endorsed fatigue and memory problems.  Tr. 894.

On March 10, 2017, Dombeck told her chiropractor that she had headaches and neck pain.  Tr. 516.  In April she told her chiropractor that she improved since her last visit and was working out more.  Tr. 518.  On August 4, she reported that her head "was bad" and that she had had a headache "since Tuesday."  Tr. 526.

5

On August 9, 2017, Dombeck went to her family physician and reported ongoing headaches, insomnia, increased anxiety and depression.  Tr. 681.  She was "not to the level of wanting an antidepressant, but feels that help with sleep would be reasonable."  Tr. 681.  She asked if she could get an order for routine massages due to her head injury and whiplash.  Tr. 681.  Her sleep medications were restarted.  Tr. 682.

On August 25, 2017, Dombeck saw her chiropractor and reported that she had more neck tension from her job.  Tr. 529.  At a counseling evaluation on August 30, Dombeck reported having been in a severe car accident 1.5 years prior that left her with a brain injury that still impacted her functioning.  Tr. 1238.  In terms of her job performance history, she indicated that she had above average attendance at work and good performance.  Tr. 1241.  She had been working part-time in a small office that was quiet and simple and made her feel comfortable.  Tr. 1238.  She also stated that she worked at Planet Fitness.  Tr. 1239.  She suffered from fatigue.  Tr. 1238.  She endorsed depression, bereavement issues, anxiety, traumatic stress, inattention, mood swings, noise sensitivity, and sleep problems.  Tr. 1239, 1243-1244.

On September 13, 2017, Dombeck had an appointment related to a gastrointestinal problem and reported regular exercise including walking, hiking, and weight training.  Tr. 848.

On October 5, 2017, Dombeck had a follow up visit for an overactive bladder.  Tr. 418-419.  The treatment note explained that she had planned to try medication to treat that problem but she reported that her symptoms had "improved greatly" after she sought help with her anxiety issues.  Tr. 419.  "She is very pleased and doing great."  Tr. 419.  Upon exam, she was cooperative, pleasant, in no acute distress, alert and oriented, well hydrated, and well nourished.  Tr. 419.

On January 11, 2018, Dombeck had a physical therapy appointment and stated that she was more mentally fatigued.  Tr. 560.  On January 12, Dombeck saw her chiropractor and reported neck pain and headaches, which had gotten better since her last visit.  Tr. 1028.  She was "working hard, working out."

6

Tr. 1028.  On January 18 she had a physical therapist visit and complained of fatigue and feet pain but she "[m]ay try to do a short hike this weekend if weather permits."  Tr. 563.  On January 22, her feet felt better and she reported overall fatigue.  Tr. 564.

On March 7, 2018, Dombeck saw her chiropractor and reported that her headaches were somewhat better.  Tr. 1038.  On March 12 Dombeck visited her family physician's office for a well exam.  Tr. 664.  She reported having a good energy level, she was sleeping well, and she exercised 3-4 times per week.  Tr. 664.  On March 16 she reported "less" headaches to another physician.  Tr. 1075. On March 30 she returned to her chiropractor and stated, "[d]oing much better.  Carried a recliner up the steps.  Yesterday, sore."  Tr. 1046.

An April 2018 cervical spine MRI was unremarkable.  Tr. 573.

On May 25, 2018, Dombeck had her tenth physical therapy visit and reported increased symptoms and headache on Wednesday and Thursday "secondary to doing a lot of yard work and working at a desk as well."  Tr. 584.  She took her headache medication on Thursday and felt better, with no complaints of a headache at her visit.  Tr. 584.  She reported "fatiguing less with activity as she is able to do more and feels stronger."  Tr. 585.  Her symptoms no longer disrupted her sleep.  Tr. 585.

On June 27, 2018, Dombeck visited her family physician's office for a follow-up for her anxiety, insomnia, and chronic fatigue.  Tr. 661.  She exercised three to five times a week, her sleep patterns had improved, she had occasional headaches, and she had just been released from physical therapy for her neck with "marked improvement."  Tr. 661.  She did not need a refill on her sleep or headache medications.  Tr. 661.  On September 26 she reported that she continued to exercise (yoga and walking), her sleep had improved, and she had headaches "often but not on a daily basis."  Tr. 660.  She had been sick recently and was able to bounce back easier than she had in the past and was "very pleased."  Tr. 660.

7

On October 2, 2018, Dombeck saw her chiropractor and reported some improvement in symptoms since her last visit and that she was "not too bad." Tr. 1062. On December 14 her neck was sore from playing violin. Tr. 1143. On December 19 she reported at a family doctor visit that her mood was unchanged, she "still had problems sleeping," and she had had headaches weekly. Tr. 742. She had lost her job due to downsizing. Tr. 742. She had joined a new church, participated in two holiday concerts, and continued to meet with her life coach/counselor every week. Tr. 742. Upon exam, she was alert and in no acute distress. Tr. 742. She was assessed as "stable and doing well" and did not need medication refills. Tr. 742.

 On March 6, 2019, Dombeck visited her family doctor's office for a follow-up. Tr. 1096. She exercised one to three times a week and her depression had worsened; she was frustrated that she could not overcome the fatigue and mental exhaustion required to work outside her home. Tr. 1096. She was to start working part time at an herbal store and the employer was aware of her "ongoing medication issues" and was willing to work with her. Tr. 1096. She still had trouble sleeping and had occasional headaches. Tr. 1096. She had been attending small group at her new church. Tr. 1096. She had started making and selling soup out of her home and was working to build that endeavor, and she was interested in marketing a new product. Tr. 1096. She was assessed with chronic fatigue and post concussive syndrome and blood work was ordered. Tr. 1097.

On May 7, 2019, Dombeck, after having started a new thyroid medication, stated that she was feeling "much better than she has in a long time;" she was seeing someone, she was able to work an entire shift and had not called off since starting her new job, and she was sleeping better. Tr. 1088.

On October 8, 2019, Dombeck went to her chiropractor and reported a headache and fatigue. Tr. 1230. On October 16 she went to her family doctor's office for a follow up. Tr. 1078. Her general mood and sleep patterns had improved and she had headaches often but not on a daily basis; she had a

headache that day for the first time in two weeks; two weeks ago she had fallen, which caused neck discomfort and fatigue. Tr. 1078. Work was going well but she had to call off twice since her injury. Tr. 1078. Upon exam, she was alert, well-groomed, oriented, in no acute distress, and had normal coordination. Tr. 1079.

On October 18, 2019, Dombeck had a telephone session with her counselor at her request before Dombeck left for vacation that week. Tr. 1251. She ended the call early due to feeling fatigued. Tr. 1251.

On November 19, 2019, Dombeck had a counseling appointment and was irritable due to her grieving over the end of a relationship. Tr. 1256. She also felt pride in her ability to "continue on and work" and to "move on and focus on self and career." Tr. 1256.

**C.     State Agency Reports**

On February 5, 2019, state agency reviewer Todd Finnerty, Psy.D., reviewed Dombeck's records and opined that her mental impairments were not severe. Tr. 93. On March 5, 2019, Courtney Zeune, Psy.D., affirmed Dr. Finnerty's opinion. Tr. 108-109.

On January 29, 2019, state agency reviewer Gary Hinzman, M.D., reviewed Dombeck's record and opined that she could perform light work, had some postural limitations, and must avoid all exposure to hazards and commercial driving due to migraines and headaches. Tr. 95. On March 5, 2019, Anne Prosperi, D.O., affirmed D. Hinzman's opinion. Tr. 111.

**D.     Hearing Testimony**

During the December 19, 2019 hearing, Dombeck testified to the following:

- She lives with her mother. Tr. 38. She has a driver's license and a friend drove her to the hearing. Tr. 39.

- She works part time at a health store selling vitamins and supplements for about 20-27 hours a week. Tr. 43. She also works part time from home on her own doing health and wellness coaching. Tr. 39. Depending on how she is feeling, she will work no hours or up to ten

hours a week, in a group or one-on-one.  Tr. 40-41.  They discuss what to eat and how to supplement their diet; she is associated with a company that promotes products that she sells to her clients.  Tr. 41-43.  She has been doing that since 2014.  Tr. 43

- When asked what her biggest health problem preventing her from full time work was, she stated, "fatigue, cognitive fatigue" from her traumatic brain injury in January 2016.  Tr. 54.  Her fatigue can get better and she has more clarity, but she fatigues quicker and it takes her longer to recover.  Tr. 55.  She experiences fatigue when she exercises physically and when she is performing mental activities.  Tr. 56.  When she fatigues she can't keep her focus going; it can start with confusion or a slower processing time.  Tr. 56.  She can get nauseated, she will start to get a headache, and she will be more sensitive to light and sound.  Tr. 56.  Then she develops a migraine.  Tr. 56-57.  The amount of sleep she gets at night does not cure her fatigue.  Tr. 57.  She has some sleep challenges and takes medication or supplements to help.  Tr. 57-58.

- She used to get migraines before her fall in 2016 but they were not as intense or frequent.  Tr. 58.  She gets a migraine now about once a week and it lasts anywhere from 24-72 hours.  Tr. 58-59.  She takes medication when she feels one coming on.  Tr. 59.  She feels nauseous and vomits.  Tr. 59.

- Regarding her cognitive difficulties she developed after her fall, she is slower to process things.  Tr. 60.  It is harder for her to find the words that she needs to communicate and conversing with people is challenging and very fatiguing.  Tr. 60.  She has a harder time learning things.  Tr. 61.  It will get better and she will start to do better, and she starts a new job and does okay for a while, but the more she pushes the more her symptoms worsen and she is unable to keep up and she ends up leaving the job.  Tr. 62.  When asked about her current job at the grocery store, which she has had for some time, she explained that her boss is very generous and works with her a lot.  Tr. 62-63.  She believes that she has come in late, left early, or called off more than the average person would be permitted to do.  Tr. 63.  She works four days in a row and then takes the other days to recover.  Tr. 63-64.

- She has fibromyalgia and her injury caused neck problems, which also triggers her headaches.  Tr. 65.  When asked about her issues with urinary incontinence, she explained that it can be another effect of her body not functioning well when she is fatigued.  Tr. 66-67.  The nerves, the nausea, having to go to the restroom a lot; it all revolves around fatigue.  Tr. 67.  On a good day, if she is working a 7-hour shift, she can make it through 4 hours.  Tr. 68.

- She used to exercise a lot and she is still able to do so, but now she does it differently; she does gentle exercises like walking and can't exercise at the level she used to.  Tr. 68.  She used to go on 6-mile hikes and 20-mile bike rides after a day of work.  Tr. 69.  Now, she goes on a 1-2 mile hike at a slower pace and at the end she is fatigued.  Tr. 69.  She exercises about 3-6 times a week.  Tr. 70.

- When asked how her mental health affects her and prevents her from working full time, she stated that it affects her socially—to keep good relationships and be social.  Tr. 71.  It is

draining to connect with people emotionally.  Tr. 71.  She is more reactive.  Tr. 72.  A few months ago she had a second head injury that caused her to have crying spells; when she would go to work she was very emotional and kept crying uncontrollably.  Tr. 73.  She had to go home and take a few days off to rest.  Tr. 73.  She sees a counselor and finds it very helpful.  Tr. 73.  She is not on medication, she takes supplements.  Tr. 73.

- If she is feeling well, she is able to help with daily, household chores and to run errands.  Tr. 75.  If she is running errands she has to split them up; it is very fatiguing and stimulating to go to the grocery store.  Tr. 75.  When she is working at the store, she is able to talk to a customer who comes in and asks about a supplement.  Tr. 77.  But if customers keep coming in and other workers are helping them, it gets louder and louder and it's hard for her to continue talking to her customer, to pay attention and process the conversation.  Tr. 77.

- She enjoys hiking and having coffee with a friend at a café.  Tr. 76.  She meets with a small group at her church.  Tr. 76.

- She has good days about 1/3 of the month.  Tr. 77-78.  On a bad day, she is more fatigued and moving slower.  Tr. 78.  She may have to cut some things out of her day so she can work a 5-7 hour shift.  Tr. 78.  If it's too bad of a day she has to call off work for her own safety and stay home, rest, recover, and eliminate any stimulation.  Tr. 78.  In an average month she is absent from work 1-2 days and comes in late/leaves early 5-7 days.  Tr. 78.  When she has her 4 scheduled days off she does not set an alarm so she can sleep more.  Tr. 79.  She may have doctor appointments.  Tr. 79.  She may stay in the house and limit phone calls or email.  Tr. 79.  She will hike, walk, or clean the house, which she finds therapeutic.  Tr. 80.

The VE testified that Dombeck had past work as a health club manager and a chiropractic assistant.  Tr. 84.  The ALJ asked the VE whether a hypothetical individual with the same age, education and work experience as Dombeck could perform her past work or any other work if the individual had the following residual functional capacity: she could perform a full range of light work except she can frequently handle or finger bilaterally, frequently climb ramps or stairs but never ladders, ropes or scaffolds; can occasionally balance, stoop, kneel, crouch and crawl; can never be exposed to unprotected heights, hazardous machinery or commercial driving; is limited to a moderate noise environment consistent with an office setting, can perform simple, routine tasks and make simple work-related decisions, is limited to frequent interaction with supervisors, coworkers and the general public; and can tolerate few changes in a routine work setting.  Tr. 84.  The VE testified that the hypothetical individual would not be able to perform Dombeck's past work but could perform the following representative jobs

in the economy: office helper, stock checker, and mail clerk.  Tr. 85.  When asked about absenteeism and off-task behavior, the VE stated that an individual could not miss more than one or two days of work a month for no more than six days per year or be off-task more than 7-10% of the workday.  Tr. 86-87.

Dombeck's attorney asked the VE what the typical tolerance is for arriving late and leaving early in the jobs identified above and the VE stated that those would be considered absences.  Tr. 87.

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).  A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§

12

404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Dombeck was insured on the earliest possible disability onset date, January 20, 2016, and remained insured through December 31, 2023, her date last insured ("DLI.").  Tr. 15.  Therefore, in order to be entitled to POD and DIB, Dombeck must establish a continuous twelve month period of disability commencing between those dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2. The claimant has not engaged in substantial gainful activity since January 20, 2016, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: traumatic brain injury, recurrent migraine headaches, urinary dysfunction, bilateral plantar fascial fibromatosis, short

13

Achilles bilaterally, cervical degenerative disc disease, and depressive disorder (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can frequently handle and finger bilaterally. She can frequently climb ramps and stairs, but never climb ladders, ropes or scaffolds. She can occasionally balance, stoop, kneel, crouch and crawl. The claimant is limited to no unprotected heights, hazardous machinery, or commercial driving. The claimant is limited to moderate noise environments such as in an office setting. She is limited to simple, routine tasks and simple work-related decisions. She is limited to frequent interactions with supervisors, coworkers, and the general public. She tolerates few changes in a routine work setting.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on August **, 1983 and was 33 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from January 20, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 17-25.

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.Ohio July 9, 2010).

## VI. ANALYSIS

Dombeck argues that the ALJ's RFC assessment is not supported by substantial evidence because the ALJ failed to "adequately account" for her limitations in concentration, persistence and pace. Doc. No. 12, p. 5. She asserts, "the ALJ failed to acknowledge that Ms. Dombeck may be unable to stay alert, or work at a consistent pace, even at a simple, unskilled, routine job." Doc. No. 12, p. 6. She also argues that the ALJ did not "adequately account" for her chronic migraines and cognitive and chronic fatigue. Doc. No. 12, p. 8. As explained below, the Court finds that the ALJ's RFC assessment is supported by substantial evidence.

*Concentration, persistence and pace.*  The ALJ accounted for Dombeck's mental limitations by finding that she could work in moderate noise environments such as in an office setting; perform simple, routine tasks; make simple work-related decisions; have frequent interactions with supervisors, coworkers, and the general public; and experience few changes.  Tr. 20.  In doing so, the ALJ detailed the medical evidence in the record.  The ALJ began with Dombeck's head injury in January 2016 and her subsequent imaging, which was largely unremarkable.  Tr. 21.  In March and June 2016 she reported improvement in her symptoms.  Tr. 21.  In January 2017 she complained of continued fatigue and reported decreased activities and socialization, but she was found to have normal orientation, attention, cognition, and memory.  Tr. 21.  In March 2017 she was assessed as having normal cognitive functioning for her age.  Tr. 21.  She underwent counseling in 2017, but those records were "largely symptom-based" and "lacked mental status examination findings."  Tr. 21.  The ALJ acknowledged Dombeck's reports of fogginess, fatigue, and lack of focus.  Tr. 21.  Toward the end of 2017 and in 2018 Dombeck was engaged in greater activity (hiking, yard work, playing the violin, working at a desk).  Tr. 22.  She reported doing well but being exhausted and foggy; mental status exams showed that she was alert and in no acute distress.  Tr. 22.  Treatment records in 2019 showed no significant changes in her symptoms or treatment, she performed regular exercise, and mental status exams showed her to be alert and in no acute distress.  Tr. 22.  Dombeck does not challenge the ALJ's recitation of that evidence.

The ALJ stated that he found Dombeck's allegations regarding the nature of her symptoms and impairments to be not fully consistent with the medical evidence of record.  Tr. 20, 23.  He reiterated that her imaging studies after her fall in January 2016 were unremarkable (other than some suggestion of diminished signal in the left lateral aspect of the pituitary gland) and that further imaging had not been warranted.  Tr. 23.  Despite her reported lack of focus, fogginess, and fatigue, her mental health treatment was limited and her reported activities were inconsistent with the significant degree of

17

limitations she alleged: she did yard work, hiked, played the violin, worked at home, performed activities of daily living, shopped in stores, read, watched movies, attended church, and got along with others.  The ALJ concluded, "the combination of moderate findings during treatment, conservative treatment, and a wide range of activities, supports the residual functional capacity finding."  Tr. 23. Dombeck does not challenge the ALJ's reasoning or characterization of the evidence.  The ALJ's reliance upon the evidence he cited was proper and supported his conclusion.  *See* SSR 16-3p, 2017 WL 5180304, at *5-8 (to evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, treatment received, daily activities, and other evidence).  Moreover, in her brief, Dombeck does not identify evidence in the record other than her subjective complaints regarding her cognitive issues and chronic fatigue.  Doc. No. 12, p. 3.  Her statements, alone, do not establish that she is disabled.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (an individual's statements about pain or other symptoms will not alone establish a disability); 20 C.F.R. § 404.1529(a).

Dombeck's reliance upon *Schalk v. Commissioner of Social Sec.*, 2011 WL 4406824 (E.D. Mich. Aug. 30, 2011)[3] is misplaced.  Doc. No. 12, p. 7.  In *Schalk*, the court found that the ALJ violated the treating physician rule when he failed to evaluate a therapist's opinion that the claimant had marked limitations in his ability to concentrate and perform at a consistent pace and failed to explain why he excluded such limitations in his RFC assessment.  *Id*. at *4, 11.  Here, there was no opinion in the record stating that Dombeck had limitations in her ability to concentrate, persist, and maintain pace.  Although the ALJ found Dombeck to have a moderate limitation in that area at step three, the limitations identified in the paragraph B criteria at step three are not an RFC assessment.  *See* SSR 96-8p, 1996 WL 374184, *4 (July 2, 1996); *Taylor v. Colvin*, 2016 WL 760399, at *13 (N.D. Ohio Feb. 26, 2016) ("[I]t is well established that the paragraph B criteria used at steps 2 and 3 of the sequential analysis is 'not an RFC

---

[3] Report and recommendation adopted, 2011 WL 4406332 (E.D. Mich. Sept. 22, 2011).

assessment.'" (collecting cases)).

Dombeck asserts that that state agency reviewers' opinions—that she had no severe mental impairments—were the only opinions in the record regarding her mental limitations and complains, "it cannot be clear to subsequent readers[] how the ALJ determined what limitations should be included in the [RFC] determination.  The assumption can only be that the ALJ relied on his own lay opinion of the medical evidence of the record..."  Doc. No. 12, p. 7.  But it is the ALJ's responsibility to determine a claimant's RFC, not a physician's.  *See* SSR 96-5p, 1996 WL 374183, at * 2 (July, 2, 1996); *Shepard v. Comm'r of Soc. Sec.*, 705 Fed. App'x 435, 442–443 (6th Cir. 2017)("[T]o require the ALJ to base her RFC on a physician's opinion, would, in effect, confer upon the [physician] the authority to make the determination or decision about whether an individual is under a disability." (quoting *Rudd v. Comm'r of Soc. Sec.*, 531 Fed.App'x. 719, 728 (6th Cir. 2013)); *see also Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 Fed.App'x 395, 401-02 (6th Cir. 2018) ("We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ….The ALJ undertook a laborious evaluation of the medical record when determining the residual functional capacity, and substantial evidence supports the ALJ's conclusions."); *Tucker v. Comm'r of Soc. Sec.*, 775 Fed.App'x 220, 226 (6th Cir. 2019) ("No bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding, but the administrative law judge must make a connection between the evidence relied on and the conclusion reached."); *Van Pelt v. Comm'r of Soc. Sec.*, 2020 WL 7769729, at *10-11 (N.D. Ohio Dec. 30, 2020); *Young-Roach v. Soc. Sec. Admin.*, 2021 WL 4553128, at *13 (N.D. Ohio Oct. 5, 2021).

Here, the ALJ undertook a "laborious evaluation" of the medical record when determining Dombeck's RFC and made a connection between the evidence he relied upon and his conclusion, as

19

described above.  Tr. 22 (ALJ explaining that the combination of unremarkable exam findings, conservative treatment, and the wide range of Dombeck's regular activities supports the RFC limitations); *Mokbel-Aljahmi*, 732 Fed. App'x 395, 402; *Tucker*, 775 Fed.App'x at 226.  The ALJ's explanation is sufficient and is supported by substantial evidence.  *Id*.

*Chronic migraines and cognitive and chronic fatigue*.  Dombeck argues that the ALJ "also failed to fully address Ms. Dombeck's chronic migraines, cognitive fatigue, and chronic fatigue."  Doc. No. 12, p. 8.  She submits, "The record consistently documents Ms. Dombeck's migraines and headaches, lasting 24 to 72 hours, and associated with phonophobia, photophobia, lightheadedness, nausea, and vomiting" and "consistently documents Ms. Dombeck's consistent and credible issues with cognitive and chronic fatigue, especially when under stress or during long periods of activity."  Doc. No. 12, p. 8.

As explained above, Dombeck does not challenge the ALJ's evaluation of her statements regarding her symptoms.  Nor does she challenge the ALJ's recitation of the record evidence, which, the ALJ observed, showed that Dombeck had reported that her headaches had improved and she had not sought additional or more frequent treatment.  Tr. 21, 22, 23.  The ALJ acknowledged that Dombeck went to the emergency room for a headache in November 2016 and was treated with IV Toradol and Zofran.  Tr. 21, 23; Tr. 405 (treatment note stating that Dombeck drove herself to the emergency room for a headache; upon exam her vital signs were stable and she was awake and alert; and she was treated, improved, and was discharged).  The ALJ remarked that Dombeck had reported light and noise sensitivity and limited her to working in a moderate noise work environment consistent with an office setting.  Tr. 20; Tr. 77 (Dombeck's testimony stating that she has difficulty performing her job at the store when noise levels increased).  The ALJ commented that Dombeck reported feeling "exhausted and foggy" but that her mental exam findings were normal, she had conservative treatment, and she was able to engage in various activities (yard work, playing the violin, working at a desk, activities of daily

living, shop in stores, read, watch movies, go to church, get along with others, hiking).  Tr. 22, 23.  The

ALJ's RFC assessment is supported by substantial evidence.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final

decision be AFFIRMED.


Date: January 3, 2021                                  _s/ Jonathan Greenberg_
                                                       Jonathan D. Greenberg
                                                       United States Magistrate Judge




### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**